HUTCHINGS vs TALBOT *et al.* Lessee.

*margin: 1813. Hutchings vs Talbot*

*margin: December.*

APPEAL from *Baltimore* County Court. An action of ejectment was brought on the 12th of March 1807, in the name of *Richard Smith*, on a joint demise to him by *Talbot*, and others, on the 1st March 1807, for the recovery of four tracts or lots of land, Nos. 33, 36, 39 and 48. The defendant, (now appellant,) appeared and entered into the common rule. At October term 1808, the plaintiff prayed leave to amend his declaration, which was granted by the court; and at the next term, (March 1809,) a new declaration was filed, in the name of *Richard Fenn*, on separate demises to him by the said *Talbot*, and others, each on the 1st of January 1808, of an undivided third

*margin note: An amendment may be made to a declaration in ejectment so as to change the demise from a joint one by all the lessors, to separate demises for undivided portions.*
*The change of the name of the fictitious lessee in the amended declaration, is of no consequence, the defendant having afterwards appeared to it, and entered into the common rule. Quere, if it may not then be considered as a new action?*

A copy of the qualification of G D, as one of the commissioners to preserve confiscated *British* property, purporting to have been made before W H, a justice of the peace, certified by the auditor general as a true copy taken from the original filed in his office; and a copy taken from the proceedings of the said commissioners stating that G D appointed a commissioner, &c. produced a certificate of his qualification, &c. certified as above, with proof by a witness that he had examined that part which purports to be the qualification of G D, and that it is a true copy of the original, in the hand writing of G D, and that the name W H, signed thereto, was in the hand writing of the said W H; and that the other copy was a true copy from the Journal of proceedings of the commissioners, &c. admitted to be read in evidence

A deed executed by certain persons, stating themselves to be commissioners appointed to preserve confiscated *British* property, to certain purchasers of such property, is sufficient to vest a title in the purchasers, so as to enable them to support an action of ejectment for the land conveyed.

A grant dated the 8th of February 1802, to E and D, for the same land conveyed by the commissioners appointed to preserve confiscated *British* property, to the lessor of the plaintiff, on the 12th of December 1785, which grant recited that E O purchased the land of the commissioners, a certificate whereof was lodged in the land office; that E O sold the land to E S, who died intestate, and that the land had descended to E and D, his heirs at law—*Held*, that the legal title in the land did not pass to E and D by the grant.

part of four lots or tracts of land, being part of a tract of land called *My Lady's Manor*, and which lots are distinguished and known by Nos. 33, 36, 39 and 48. To which the defendant appeared at the said term, entered into the common rule, and pleaded the general issue.

1. At the trial the plaintiff offered to read in evidence the following paper: *Maryland.* sct. On the 12th day of July, in the year 1781, came before me, the subscriber, one of the justices of the peace for *Anne-Arundel* county, *Gabriel Duvall*, and made oath that he, as commissioner under the act for appointing commissioners to preserve confiscated *British* property, will to the best of his skill and judgment execute the trust reposed in him, and the duties of his office, diligently and impartially, according to the tenor of the said act.

*Wm. Hyde.*

The copy from the original qualification filed in my office. *Robt. Denny,* Auditor Gen'l.

Friday July 13, 1781. *G. Duvall* appd. comm. by the govr. and co. in the room of Col. *Forrest* who resigned, produced a certificate of his qualification in the manner required by law.

True copy from the books of the commissioners for the preservation and sale of confiscated *British* property, lodg. in my office. *Robt. Denny,* Auditor Gen'l.

Auditor's Office, *Annapolis,* April 16, 1809.

Having first given evidence by *Luther Martin,* a witness duly sworn, that he had examined that part of the said pa; per which purports to be the qualification of *Gabriel Duvall,* as one of the commissioners of confiscated *British* property, and that the said part is a true copy of the original qualification in the hand-writing of said *Duvall,* filed in the office of *Robert Denny,* auditor of the state, and that the name of *William Hyde,* signed thereto, as being a justice before whom the said *Gabriel Duvall* was sworn, was in the hand-writing of said *Hyde,* and that the residue of the said paper is a true copy from the journal of proceedings of the commissioners, kept by their clerk, which were in the auditor's possession, and under his care, and by him produced. The defendant objected to the reading of said paper in evidence. But the Court, [*Nicholson,* Ch. J.] overruled the objection, and suffered it to be read to the jury. The defendant excepted.

2. The plaintiff then gave in evidence thirty-three deeds, recorded among the land records of *Baltimore* county, for the conveyance of confiscated *British* property, wherein *Gabriel Duvall* and *Clement Holliday*, as commissioners for preserving of confiscated *British* property, are the grantors. And also read in evidence a deed from the said "*Clement Holliday* and *Gabriel Duvall*, to *Thomas, Mary,* and *Anne Talbot,* three of the lessors of the plaintiff, dated the 12th of December 1785, and stated to be to them from *Clement Holliday* and *Gabriel Duvall,* two of the commissioners appointed to preserve confiscated *British* property;" and also stating, that on the 22d and 23d of October 1782, the commissioners for the time being, by virtue of an act of the general assembly, entitled, "An act for the sale of certain confiscated *British* property pledged for the redemption of certificates," and another act, entitled, "An act to postpone the sale of certain confiscated *British* property for the redemption of certificates," and by virtue of other the acts of the general assembly touching and concerning the confiscation, preservation, and sale of *British* property, did sell and dispose of *My Lady's Manor* in *Baltimore,* or *Baltimore* and *Harford* counties, and at the said sale *Edward Oldham* of *Baltimore* county, for and on behalf of the said *Mary, Anne,* and *Thomas Talbot,* became the purchaser of lots Nos. 33, 36, 39 and 48, &c. Whereby was granted, &c. to the said *Mary, Anne,* and *Thomas Talbot,* as tenants in common, and not as joint tenants, the said lots, &c. The said deed was regularly acknowledged and recorded. He also gave in evidence, that before the institution of this suit *Mary* married *Dickerson Gorsuch,* and that *Anne* married *Thomas Bond,* two of the lessors of the plaintiff, and that they are now their respective wives. The defendant then prayed the opinion of the court, and their direction to the jury, that the plaintiff was not entitled to recover. Which direction the court refused to give. The defendant excepted.

3. The defendant then read in evidence a patent, dated the 8th of February 1802, to *Elizabeth Miles* and *Dixon Stansbury,* reciting, that "*Aquila Miles,* and *Elizabeth* his wife, by their petition to the chancellor did set forth, that a certain *Edward Oldham* purchased of the commissioners for confiscated estates Lots Nos. 33, 36, 39 and 48, lying in *Baltimore* county, parts of *My Lady's Manor,*

1813.
Hutchings
vs
Talbot.

certificates whereof were returned to the land office; that the said *Edward Oldham*, afterwards sold the said lots for a valuable consideration, to *Edmund Stansbury*, (late deceased,) and by an instrument of writing under his hand, bearing date the 14th day of October 1783, requested that the said lots might be conveyed to the said *Stansbury;* that the said *Edmund Stansbury* departed this life in the year 1801, without having made a will, whereupon his estate descended to the petitioners *Elizabeth* and *Dixon Stansbury,* now in his minority, his only children and heirs at law. The petitioners therefore prayed that patents might issue to them for the said lots. Patents were accordingly ordered. The state did therefore grant to them lot No. 86, &c. It was admitted there were three other patents, of the same tenor and date, to same patentees, for the other three lots in the declaration mentioned. The defendant also gave in evidence, that the said patentees were the children of *Edmund Stansbury*, and that he the defendant was the tenant of said patentees. He also gave in evidence, that the lands specified in said patents, and the premises in the declaration mentioned, were the same. And he then prayed the court to direct the jury, that the legal title in the premises passed under and became vested in the patentees, in virtue of the said patents, and that the plaintiff was not entitled to recover. This direction the court refused to give. The defendant excepted; and the verdict and judgment being against him, he appealed to this court.

The cause was argued before CHASE, Ch. J. and BUCHANAN, EARLE, and JOHNSON, J.

*T. Buchanan,* for the Appellant, contended, 1. That a declaration in ejectment being an original process cannot be amended, because there was nothing to amend by. The amendment in this case was unauthorised so as to change the demise. An amendment might be permitted to enlarge the term, but for no other purpose. Here the amendment introduced a new title—the parties and demises were totally different. The original lessee could not recover under the first declaration, the lease therein being a joint demise of all the lessors.

2. That the evidence offered in the *first* bill of exceptions, to prove that Mr. *Duvall* was a commissioner of confiscated *British* property, was not sufficient. That copies

from the commissioners books were not evidence. But if those books were to be considered as now belonging to the auditor's office, such copies should be certified and proved, as directed by the act of 1798, *ch.* 108. The evidence of Mr. *Duvall's* appointment could only be had from the records of the council, by whom it was made, that less evidence was not admissible, except by proof that there was no entry of the kind on those records, when inferior evidence might have been received. It was not proved, (as it *could not be,*) that Mr. *Duvall* was dead; and as he was not dead his evidence might have been admitted to prove his appointment.

3. As to the *second* bill of exceptions. If the evidence offered was sufficient to prove Mr. *Duvall* to be one of the commissioners appointed in the place of one of those named in the act of October 1780, *ch,* 49, who is said to have resigned, yet it is contended, that there was no power given to the commissioners to convey any land which they were authorised to sell. He referred to the acts of October 1780, *ch.* 45, *ch.* 49, and *ch.* 51, and 1785, *ch.* 66.

4. As to the *third* bill of exceptions. That *Oldham* was a purchaser from the commissioners of the property in question, and if he purchased for the lessors of the plaintiff, it was a trust which the commissioners could not notice, and could only be enforced in equity. If the commissioners had authority to convey, they should have conveyed to *Stansbury* as the assignee of *Oldham.*

*Martin*, for the Appellee, contended, 1. That an amendment might be permitted in an action of ejectment. That it was allowed by the general court in *Steuart et al. Lessee vs. Mason.* On the appearance of the defendant to the declaration filed in 1809, all defects, if any, were waived, and the action from that time may be considered as a new one, and the prior proceedings may be excluded from the record, so that it is wholly immaterial whether the leave to amend was proper or not.

2. As to the *first* bill of exceptions. The appointment of Mr. *Duvall* as a commissioner, was not to be found on the proceedings of the council, and the only evidence of it was in the auditor's office. The act of 1798, *ch.* 108, only points out a new way of proving the papers in that office. Here the copy was proved by a person who had examined

it with the original. It was correctly received in evidence under the spirit of the act of 1798, and independent of that act the copy might be received upon common law principles. He cited 2 *Esp. Dig.* (473,) 764, (475,) 766, (514,) 783.

3. As to the *second* bill of exceptions. The copies being received as evidence laid the foundation for what was afterwards introduced. This is a case where the law dispenses with the best evidence which the nature of the case would admit of. It is not necessary to prove more than that an officer was such *de facto,* and acted as such. He referred to 2 *Esp. Dig.* 788, (515.) *Owings vs. Wyant,* 3 *Harr. & M'Hen.* 393.

4. The deed by the commissioners was prior to the grant. If the chancellor had known of the deed he would not have granted the patent. There is no other evidence of the assignment to *Stansbury,* but the recital in the grant. As the state's right had passed by the commissioners' deed, nothing passed by the grant.

THE COURT concurred with the County Court in the opinions expressed in the several bills of exceptions; and were of opinion there was no error in the proceedings.

*JUDGMENT AFFIRMED.*